# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, A.C. RUGH**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**JERRY G. PARKER**
**CORPORAL (E-4), U.S. MARINE CORPS**

**NMCCA 201500158**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 13 Jan 2015.
**Military Judge:** LtCol V.C. Danyluk, USMC.
**Convening Authority:** Commander, Marine Corps Base, Quantico, VA.
**Staff Judge Advocate's Recommendation:** LtCol Troy H. Campbell, USMC.
**For Appellant:** LT David Warning, JAGC, USN.
**For Appellee:** LCDR Justin Henderson, JAGC, USN; Capt Cory Carver, USMC.

**18 February 2016**

---

**PUBLISHED OPINION OF THE COURT**

---

RUGH, Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of one specification each of making a false official statement, rape using unlawful force, and sexual assault on a person incapable of consenting due to impairment, in violation of Articles 107 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 920. The members sentenced the appellant to three years' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a bad-conduct discharge.

Prior to sentencing, the military judge conditionally dismissed——pending appellate review——the conviction for sexual assault as an unreasonable multiplication of charges with rape.[1] The convening authority approved the sentence as adjudged.

The appellant raises six assignments of error (AOE):

(1) The military judge abused her discretion when she denied a member's challenge for cause for bias;

(2) The rape conviction was legally and factually insufficient;

(3) The military judge abused her discretion when she denied the appellant's request for a continuance;

(4) The appellant's pretrial restriction was tantamount to confinement;

(5) Trial defense counsel's failure to raise the pretrial restriction tantamount to confinement issue amounted to ineffective assistance of counsel; and

(6) Panel members were selected in violation of Article 25, UCMJ, 10 U.S.C. § 825, and failure to raise this violation amounted to ineffective assistance of counsel.[2]

We find the rape conviction legally and factually insufficient. We revive the conditionally dismissed sexual assault conviction and reassess the sentence below. We disagree with the remaining AOE and resolve them in the order they occurred at trial.

**Background**

On 9 August 2013, after a 14-hour workday, then-Corporal (Cpl) EM returned to Joint Base Fort Myer-Henderson Hall to unwind. He poured himself a number of stiff drinks, and by 2230 he was "wobbling back and forth."[3] Cpl EM then left the barracks patio where he had been engaged with a group of friends and weaved his way back to his room.

On the way the appellant appeared at Cpl EM's side to help him down the hallway. The appellant assisted Cpl EM to his bathroom where Cpl EM crouched over the toilet feeling ill. The appellant then left the room but returned quickly after borrowing a copy of Cpl EM's room key from the duty desk. Cpl EM crawled from the bathroom, only to promptly vomit on his bedroom floor.

---

[1] *See United States v. Thomas*, 74 M.J. 563, 568 (N.M Ct.Crim.App. 2014) (instructing that, when a panel returns guilty findings for multiple specifications charged for exigencies of proof, it is incumbent upon the military judge either to consolidate or dismiss the contingent specification, not merely merge them for sentencing purposes).

[2] Submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] Record at 504.

The appellant assisted Cpl EM to his bed where Cpl EM removed his shirt, flopped onto his stomach, and used the headboard to pull himself to the top of the bed. Then, the appellant slid his hand under Cpl EM's body and rocked him back-and-forth until he rolled Cpl EM onto his back. Cpl EM testified, "I began to look up and, like, the room was just spinning in circles – over and over and over and over and over."[4]

Once Cpl EM was on his back, the appellant pulled Cpl EM's penis from his pants and underwear and said, "I'm going to suck your penis." He then put Cpl EM's penis in his mouth. Soon, the appellant stopped and rolled Cpl EM onto his stomach. This time Cpl EM stated he tried to resist being rolled but "couldn't do anything."[5]

Afterwards, Cpl EM vomited on the side of his bed and onto the floor, and the appellant left. Cpl EM passed out, waking again in the early morning hours still intoxicated. He found his friend in the duty hut and, unable to articulate the assault, wrote out a short statement, "[the appellant] just tried to rape me."[6]

## Legal and Factual Sufficiency[7]

We review questions of factual and legal sufficiency *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (internal quotation marks and citations omitted). In weighing questions of legal sufficiency, the court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The test for factual sufficiency is "whether after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

The appellant has challenged the factual and legal sufficiency of his rape conviction asserting that the evidence fails to demonstrate "unlawful force." We agree.

The relevant part of Article 120, UCMJ, is as follows:

(a) *Rape*. Any person subject to this chapter who commits a sexual act upon another person by—

(1) using unlawful force against that other person;

---

[4] *Id*. at 508.

[5] *Id*. at 509.

[6] Prosecution Exhibit 8 at 2.

[7] Raised as AOE (2).

3

. . . .

is guilty of rape and shall be punished as a court-martial may direct.

10 U.S.C. § 920(a).

Under the statute, "force" is defined as:

(A) the use of a weapon;

(B) the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or

(C) inflicting physical harm sufficient to coerce or compel submission by the victim.

10 U.S.C. § 920(g)(5). "Unlawful force" is defined as "an act of force done without legal justification or excuse." 10 U.S.C. § 920(g)(6).

For a charge of rape by unlawful force, the Government must prove beyond reasonable doubt that the accused used a weapon; used such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or inflicted physical harm sufficient to coerce or compel submission by the victim, and that those acts were "done without legal justification or excuse." 10 U.S.C. § 920(g)(5)–(6).

*Discussion*

As there was no allegation that the appellant used a weapon or inflicted physical harm, we analyze the record to determine whether he used physical strength sufficient to overcome, restrain or injure Cpl EM. We further narrow our analysis by finding that the appellant's actions in rolling Cpl EM onto his back and removing Cpl EM's penis from his pants did not injure or serve to restrain Cpl EM. It remains then whether these acts by the appellant were sufficient to "overcome" Cpl EM.

In determining whether an act is sufficient to overcome a person, consideration of that person's nature or abilities is pertinent. For example, a disparity in the physical prowess between the attacker and the attacked may be relevant to evaluating the degree of physical strength or violence needed or used.[8] But too great an emphasis on an individualistic evaluation of the victim's abilities is misplaced. If only the victim's abilities mattered, the offense of rape using unlawful force would wholly subsume the offenses of sexual assault of one asleep, of one incapable of consenting due to impairment, or of one incapable of consenting due to physical disability. *See* 10 U.S.C. § 920(b)(2) and (3). Therefore, "force" is more than just a measure of the victim's ability to be overcome. It is also a complimentary measure of the degree of force actually used by the perpetrator.

---

[8] Of note, Cpl EM outweighed the appellant by more than 60 pounds.

This notion of force is consistent with this and other military courts' prior analysis. *See United States v. Thomas*, 74 M.J. 563, 567 (N.M.Ct.Crim.App. 2014) (holding that, "simply being on top of the other person during a sexual act, without anything more, is not enough" to prove the use of such physical strength or violence as was sufficient to overcome, restrain, or injure); *United States v. Hutchinson*, No. 201400022, 2015 CCA LEXIS 71 at *12, unpublished op. (N.M.Ct.Crim.App. 4 Mar 2015) (affirming a conviction for rape using unlawful force under circumstances in which the appellant forcibly flipped the victim over, put his hand on her neck so that she could not breathe, removed her pants while the victim protested, and then penetrated her vagina with his penis while choking her as she told him "no"), *rev. denied*, 75 M.J. 42 (C.A.A.F. 2015); and *United States v. Evans*, No. 38651, 2015 CCA LEXIS 445 at *6, unpublished op. (A.F.Ct.Crim.App. 22 Oct 2015) (affirming a conviction for rape using unlawful force under circumstances in which the appellant grabbed the victim by the arm, put his hands around her neck, dragged her to some bushes, and pulled her to the ground).

In this case, in which the force used to commit the sexual act was limited to rolling the victim over onto his back and exposing his penis, evidence of force sufficient to overcome the person is absent. While we are mindful of Cpl EM's extreme intoxication and his testimony that he was limited in his ability to resist due to that intoxication, a greater degree of force is required. At the least there necessitates some demonstration that the force used was objectively capable of overcoming Cpl EM's resistance. Here there was none. The appellant rolled Cpl EM onto his back and placed Cpl EM's penis in his mouth without confrontation and with minimum effort. While clearly sufficient to establish sexual assault, the statute requires more for a conviction of rape.

As our review of the record fails to discern any evidence that the appellant used unlawful force as defined in the statute to commit a sexual act upon Cpl EM, we conclude that the appellant's rape conviction cannot withstand the tests for legal or factual sufficiency. We will set aside that finding of guilty and dismiss the specification.

### Restriction Tantamount to Confinement[9]

The appellant was arraigned on 2 September 2014. On 15 September 2014 the appellant's command was notified that he had produced a positive urinalysis sample for the marijuana metabolite. The next day, he was placed on pretrial restriction, and on 2 December 2014 he received nonjudicial punishment of reduction in rank to pay grade E-4 and forfeiture of $1,213.00 pay per month for two months, the latter suspended for six months. He remained in pretrial restriction until he was sentenced in this case on 13 January 2015.

According to the appellant, the conditions of restriction limited his movements to Joint Base Fort Myer-Henderson Hall.[10] He was permitted to visit the Marine Corps Exchange, the

---

[9] Raised as AOE (4).

[10] The record is largely silent on the appellant's restriction conditions. Instead, the appellant raises them now in a post-trial declaration. Since we find no merit in the appellant's assignment even assuming the conditions as raised, there is no requirement for additional fact-finding. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

5

gym, on base food establishments, and other base facilities, but was required to move about the base with an escort. During the period of restriction, the appellant mustered every two hours during the day and was restricted to his barracks room at night. He was not allowed visitors. Prior to the positive urinalysis, but after the rape allegation, the appellant was reassigned duties performing routine administrative functions. He performed these functions throughout his period of pretrial restriction.

At trial the defense did not object to the conditions on restriction, acknowledging when asked, "[t]he accused has not been in pretrial confinement, Your Honor, but he has been on pretrial restriction for 112 days or so."[11] As a result, during presentencing instructions the military judge instructed the members that they "should consider all matters in extenuation and mitigation as well as those in aggravation" in selecting a punishment, including that "the accused has been on pretrial restriction since 14 [sic] September 2014 . . . ."[12]

*Discussion*

A servicemember suspected of an offense may be subjected to pretrial restraint pending court-martial, including restriction, arrest, or confinement. RULE FOR COURTS-MARTIAL 304(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Conditions may be ordered if they are "reasonably necessary to protect the morale, welfare, and safety of the unit (or the accused); to protect victims or potential witnesses; or to ensure the accused's presence at the court-martial or pretrial hearings." *United States v. Blye*, 37 M.J. 92, 94 (C.M.A. 1993) (holding order not to drink alcohol while on restriction was lawful). Conditions of restriction more rigorous than necessary to ensure the presence of an accused at trial or to prevent additional misconduct may be found to be tantamount to confinement. An appellant is entitled to day-for-day credit for time that he spends in pretrial restriction equivalent to confinement. *United States v. Mason*, 19 M.J. 274 (C.M.A. 1985) (summary disposition).

Whether an appellant is entitled to pretrial confinement credit for restraint is an issue we ordinarily review *de novo*. *United States v. Rendon*, 58 M.J. 221, 224 (C.A.A.F. 2003). However, failure at trial to seek *Mason* credit for pretrial restriction tantamount to confinement will constitute forfeiture in the absence of plain error. *United States v. King*, 58 M.J. 110, 114 (C.A.A.F. 2003). Still, as an evaluation of the merits of the claim is useful to the ineffective assistance of counsel allegation below, we take up the issue here without applying forfeiture directly.

In deciding whether conditions on restriction were the equivalent of confinement, we consider the totality of the conditions imposed, including "prior examples of such cases . . . and the factors gleaned from them." *Id*. at 113 (citations and internal quotation marks omitted).

Factors include:

---

[11] Record at 863.

[12] *Id*. at 930, 931.

6

[T]he nature of the restraint (physical or moral), the area or scope of the restraint (confined to post, barracks, room, etc.), the types of duties, if any, performed during the restraint (routine military duties, fatigue duties, etc.), and the degree of privacy enjoyed within the area of restraint. Other important conditions which may significantly affect one or more of these factors are: whether the accused was required to sign in periodically with some supervising authority; whether a charge of quarters or other authority periodically checked to ensure the accused's presence; whether the accused was required to be under armed or unarmed escort; whether and to what degree [the] accused was allowed visitation and telephone privileges; what religious, medical, recreational, educational, or other support facilities were available for the accused's use; the location of the accused's sleeping accommodations; and whether the accused was allowed to retain and use his personal property (including his civilian clothing).

*Id.* (citations omitted).  Additionally, when an appellant fails to complain of the conditions of his pretrial restriction at the time of trial, that is "strong evidence" that "the restriction was, in fact, not the same as confinement."  *Id.* at 114 (citation omitted).

After considering the nature and scope of the appellant's pretrial restriction and the alleged conditions imposed upon him, we find that the appellant's pretrial restriction was not tantamount to confinement.  Coming as it did on the heels of additional misconduct, the restriction was sufficiently tailored to ensure his presence at trial on more serious charges and to maintain good order and discipline in the unit.  The conditions were not so onerous as to fall on the "confinement" end of the restraint spectrum so as to be tantamount to it.  See *United States v. Smith*, 20 M.J. 528 (A.C.M.R. 1985) (finding that restriction *was* tantamount to confinement when the appellant was confined to the barracks during the day without an escort and to his room during the night, prohibited from performing normal duties, and required to muster every 30 minutes during non-duty hours); *Washington v. Greenwald*, 20 M.J. 699 (A.C.M.R. 1985) (finding restriction *was not* tantamount to confinement when appellant was restricted to company area, dining hall, place of duty, and chaplain's office during the day and his room at night; he signed in every hour when not at work; and required an escort to travel anywhere after duty hours); and *United States v. Delano*, 2008 CCA LEXIS 506 (A.F.Ct.Crim.App. 2008) (finding that the conditions on restriction, while strict, *were not* tantamount to confinement but were implemented to maintain good order and discipline).

## Continuance Request[13]

The charges were referred on 18 August 2014 and served on the appellant on 25 August 2014.  On 2 September 2014, the military judge arraigned the appellant and issued a trial management order docketing trial for 17 November 2014.  Subsequently, after a session held pursuant to Article 39(a), UCMJ, to litigate pretrial motions, the defense requested a continuance of trial to 5 January 2015 in order to secure the services of an expert consultant.  The military judge granted the continuance without objection from the Government.  Four weeks later, on 12 December 2014, the defense requested an additional continuance to 26 January 2015 citing a fire

---

[13] Raised as AOE (3).

at the lead counsel's home and the recent receipt of several items in discovery on 3 December 2014. These items included case agent notes, a copy of the imaged hard drive of Cpl EM's cell phone, a copy of Cpl EM's sexual assault nurse examiner (SANE) report, results of a recent interview with an ancillary witness, and Cpl EM's bank records.

The military judge denied the request for continuance noting several factors, including: that the parties, the victim's legal counsel, and the expert witnesses would not all be available again for trial until April 2015; that the accused had been serving pretrial restriction since September 2014; that there remained a month until the originally scheduled trial date; that the case was not overly complex; and that the affected defense counsel could be inconvenienced by the house fire but not unprepared for trial. The military judge invited the defense to renew their continuance request if good cause arose during their review of the new discovery. They never renewed their continuance request.

*Discussion*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." The Supreme Court has held that "this right has historically been, and remains today, the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial." *Kansas v. Ventris*, 556 U.S. 586 (2009) (citation and internal quotation marks omitted). This right extends to the "meaningful opportunity to present a complete defense." *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (citations and internal quotation marks omitted). Moreover, R.C.M. 701(e) provides that "[e]ach party shall have adequate opportunity to prepare its case[.]" When necessary to prepare its case, the military judge should grant a continuance "for as long and as often as is just." R.C.M. 906(b)(1), Discussion (citation omitted).

At trial, the appellant shoulders the burden, by a preponderance of the evidence, to show "reasonable cause" for the continuance request, *United States v. Allen,* 31 M.J. 572, 620, 623 (N.M.C.M.R. 1990), *aff'd,* 33 M.J. 209 (C.M.A. 1991), and we will reverse a military judge's decision on a continuance request only for an abuse of discretion, *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997). There is an abuse of discretion "where reasons or rulings of the military judge . . . deprive a party of a substantial right such as to amount to a denial of justice[.]" *Miller*, 47 M.J. at 358 (citations and internal quotation marks omitted). The propriety of granting a continuance is always fact-specific and must be decided in light of the peculiar circumstances surrounding each case. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

To determine whether the military judge abused her discretion, we consider the following factors:

> surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.

*Miller*, 47 M.J. at 358 (citation and internal quotation marks omitted).

8

Applying these principles and the relevant *Miller* factors to this case, we note the following:

1. *Surprise, timeliness of motion, good faith of moving party*. One month before the start of trial and within days of the fire that damaged counsel's home, the defense notified the Government and the military judge of their intent to request a continuance. The written continuance request followed one day later. There is no question that, under these circumstances, the defense filed a timely motion based upon new circumstances and did so in good faith. Likewise, much of the new discovery was provided by the Government counsel promptly upon its creation (i.e., the result of the interview with the ancillary witness); upon the Government counsel becoming aware of its existence (i.e., the imaged hard drive of the cell phone uncovered during a pretrial review of the Naval Criminal Investigative Service case file); or upon request by the defense (the case agent's notes). At least some of the new discovery had been available to the defense prior to December 2014. For example, the defense was notified that the SANE report was available for review as early as June 2014, but did not review it until a hard copy was provided in December. Regardless, the new discovery was not provided in an attempt to surprise the defense but rather in good faith.

2. *Nature of the evidence involved*. As noted by the military judge, the case was not overly complex. Although it involved testimony from a SANE and two DNA expert witnesses, the gravamen of the offenses comprised one incident and the direct (vice circumstantial) testimony of one victim, Cpl EM.

3. *Availability of witnesses and length of continuance*. The victim's legal counsel and two Government expert witnesses were not available the week requested by the defense. Additionally, the parties, the victim's legal counsel and the Government expert witness schedules would not align again until April 2015, two months after the continuance date requested.

4. *Prejudice to the opponent*. Other than the prejudice inherent in any lengthy delay, no specific prejudice to the Government is apparent in the record. Conversely, the delay requested by the defense could have resulted in an additional two months of pretrial restriction for the appellant.

5. *Prior Continuances*. The defense had previously received one continuance without objection from the Government.

6. *Reasonable Diligence by Moving Party*. Notice of the imaged hard drive of Cpl EM's cell phone was provided for the first time on 3 December 2014. In response, the defense counsel sought out and reviewed the contents of the cell phone the next day. By the time of trial, the contents of the cell phone and the other new materials appeared to be wholly incorporated into the defense strategy.

7. *Possible impact on the verdict*. Any time defense counsel raises the reasonable possibility of being unprepared for trial, a military judge must proceed cautiously. *See United States v. Powell*, 49 M.J. 220, 225 (C.A.A.F. 1998) (citing *United States v. Browers*, 20 M.J. 356, 360 (C.M.A. 1985)). During the 15 December 2014 hearing, the military judge expressed strong

confidence in the litigation abilities of the two defense counsel.  Nothing in the record now causes us to question her unreserved support for their competence and preparedness.  As is said, "the proof is in the pudding," and defense counsel's effectiveness during trial in tackling the more recently discovered evidence is that proof.

For these reasons, we do not find that the military judge abused her discretion in denying the second defense continuance request.

## Member Selection[14]

The charges in this case were originally referred to a standing convening order.  That convening order was amended by Convening Order 01-13a, to account for the appellant's request for enlisted representation; Convening Order 01-13b, to substitute member's unavailable on the day of trial; and Convening Order 01-13c, to remedy falling below enlisted member quorum after the completion of initial challenges.

During *voir dire* of the new enlisted members detailed to the court by Convening Order 01-13c, Master Sergeant (MSgt) B stated that he became aware of the court-martial after an e-mail circulated requesting nominations of potential members from subordinate commands.  The trial defense counsel requested a copy of that e-mail, but also indicated they were prepared to proceed to challenges pending its discovery.  "We don't believe we need it to finalize our panel."[15]

The entire e-mail string was discovered on the defense the next day.  The original e-mail was dated 3 November 2015 and tasked 11 subordinate commands to provide "5 Marine officers and 10 enlisted Marines for the Commander, [Marine Corps Base Quantico,] to select five enlisted members and five Marine officers.  The nominees can come from any command, except the Marine's parent command . . . ."[16]  The e-mail requested nominees of multiple ranks from Staff Sergeant (pay grade E-6) and above.[17]

A follow-on e-mail in the string identified the nominees by subordinate command.  Only some of these nominees subsequently appeared on any of the convening orders.  The final e-mail is dated 5 January 2015, the first day of trial, and requested a last minute substitute for a member unavailable due to illness.[18]  The substitute was found the same morning.  But the record does not indicate who that substitute was, or whether he or she was ever detailed to the court-martial.

---

[14] Raised as AOE (6) and submitted pursuant to *Grostefon,* supra.

[15] Record at 365-66.

[16] Appellate Exhibit LIX at 4.  The email notes that the five additional officer nominees were required "so that the Base Commander can select five officers from a list of 10 names," as a substitute for five now-unavailable officer members.

[17] At the time of the initial email, the appellant was a sergeant (pay grade E-5). He was reduced to corporal (pay grade E-4) as nonjudicial punishment on 2 December 2014.

[18] The email specifically refers to this late substitute as a "volunteer."  However, the author persistently conflates "volunteer" and "nominee" to the point of which any *post hoc* distinction becomes indecipherable.  AE LIX at 4.

After the e-mail was provided to the defense, the military judge asked whether they perceived any issues related to Article 25, UCMJ. The trial defense counsel responded, "We have had an opportunity to review it, Your Honor. There is nothing in the e-mail, itself, that is apparent, that makes it an issue."[19] However, the appellant now asserts the improper exclusion of members based on rank and the improper inclusion of volunteers.

*Discussion*

As the Government notes in its brief, R.C.M. 912(b)(1) requires the defense to raise any challenges to the member selection process by the convening authority at the next session of court after the grounds for challenge could have been discovered by the exercise of diligence.[20] *United States v. Everhart*, No. 201000065, 2011 CCA LEXIS 55 *15, unpublished op. (N.M.Ct.Crim.App. 24 Mar 2011). Failure to raise such a challenge before the examination of members "generally waives the improper selection" issue. *Id*. at *16 (citing R.C.M. 912(b)(3)).

However, while the general rule is that failure to make a timely motion waives the issue, the general rule applies only when the improper selection does not violate R.C.M. 501(a) (jurisdictional quorum), 502(a)(1) (members qualifications), or 503(a)(2) (enlisted quorum). *See United States v. Riesbeck*, 74 M.J. 176, (C.A.A.F. 2014) ("R.C.M. 912(b)(3) provides an exception to waiver where the objection is made on the basis of an allegation that the convening authority selected members in violation of R.C.M. 502(a)(1) for reasons other than those listed in Article 25(d)(2)"); *United States v. White*, 48 M.J. 251, 254 (C.A.A.F. 1998) (discussing in dicta).

As the allegation in this case alleges the use of improper selection criteria by the convening authority in violation of R.C.M. 502(a)(1), we decline to apply waiver. Instead, whether the panel was properly selected is a matter of law that we review *de novo*. *United States v. Gooch*, 69 M.J. 353, 358 (C.A.A.F. 2011).

The convening authority must personally select members who are "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2), UCMJ. The convening authority may rely on subordinates to nominate potential court members. *United States v. Benedict,* 55 M.J. 451, 455 (C.A.A.F. 2001). However, "[w]hen the request for nominations does improperly include or exclude certain members," the court must "ensure that those actions do not taint the selection by the convening authority." *United States v. Roland*, 50 M.J. 66, 69 (C.A.A.F. 1999).

In a case of systematic exclusion of members, it is the responsibility of the defense to establish the improper exclusion. *United States v. Kirkland*, 53 M.J. 22, 24 (C.A.A.F. 2000). Once improper exclusion has been shown, the burden shifts to the Government "to demonstrate

---

[19] Record at 396.

[20] Government Brief of 14 December 2015 at 41.

that the error did not 'materially prejudice the substantial rights of the accused.'" *United States v. Dowty*, 60 M.J.163, 173 (C.A.A.F. 2004) (quoting Art. 59(a), UCMJ).

Based on the record before us, we find the appellant has failed to meet his burden to establish an improper exclusion based on rank. At the time of initial request for nominees, the convening authority's staff sought out members of all ranks senior to the appellant. Indeed, Convening Order 01-13c includes a member in pay grade E-6, one pay grade senior to the appellant before he was reduced in rank shortly before trial. As a result, we find no evidence which supports the contention that the search for members specifically excluded otherwise eligible members based on their rank.

Additionally, there is no persuasive evidence that the convening authority used "volunteerism" as an impermissible criterion for selecting the members. The referenced e-mail tasked subordinate commands with identifying nominees for a venire from which the convening authority could select the panel members. Additionally, the inarticulate use of "volunteer" in follow-on e-mail is unpersuasive as within the remainder of the e-mail string and during the course of *voir dire*, there is no indication that a specific member volunteered to serve on the panel. For these reasons, we find no merit in the AOE.

## Member Challenged for Cause[21]

After the military judge ruled on challenges, the appellant's court-martial consisted of seven members with three enlisted members including MSgt R. The appellant asserts that the military judge abused her discretion in denying a challenge for cause against MSgt R. First, the appellant argues MSgt R's responses during *voir dire* demonstrated implied bias, which included a heightened interest in court-martial sentences. Additionally, the appellant asserts here for the first time that MSgt R's responses demonstrate an actual bias concerning sentencing.[22]

During group *voir dire*, the military judge instructed the members that, in determining an appropriate sentence, they "must each give fair consideration to the entire range of permissible punishments in this case from the least severe[——]*which would be no punishment at all, the conviction itself serving as the punishment[——]*to the most severe, which could include a dishonorable discharge and confinement for life."[23] All members agreed they could follow this instruction. The military judge further instructed the members that they could "not have any preconceived formula *or fixed, inelastic or inflexible attitudes concerning a particular type of punishment* . . . because the accused had been found guilty."[24] Again, all members indicated that they understood and agreed they could follow this instruction. The military judge then asked whether any member had "formed or expressed an opinion concerning the sentence to be

---

[21] Raised as AOE (1)

[22] Appellant's Brief of 13 Oct 2015 at 14, 15.

[23] Record at 179 (emphasis added).

[24] *Id*. (emphasis added).

12

adjudged in this case if sentencing was to become necessary?"[25] All members gave a negative response.

The military judge then asked whether the members were "aware of anything at all . . . that you [each member] feel should be disclosed or that you feel would have any affect on your ability to sit as a fair and impartial member in this case?"[26] All members gave a negative response. She then concluded with, "[i]f the table were turned somehow and you were sitting over there where [the appellant] is sitting today, would you be satisfied to have your guilt or innocence and sentence determined by a court member who is in your present state of mind."[27] All members gave an affirmative response.

Continuing during group *voir dire*, the trial defense counsel asked the members, "[i]f you were to decide to convict [the appellant] in this case, would you be willing to consider no punishment at all, other than conviction?"[28] MSgt R responded affirmatively. The trial defense counsel then followed up with, "[d]oes any member believe that a conviction in this case would automatically require brig time?"[29] MSgt R did not respond affirmatively.

In his court-martial questionnaire and during individual *voir dire*, MSgt R disclosed that he had observed parts of a court-martial involving allegations of male-on-female sexual assault in his previous unit. MSgt R recalled that the court-martial acquitted the accused of the allegations. When asked by Government counsel, "[w]hat you know of that process, did you feel like it was fair?" he responded, "[i]t seemed fair."[30]

In response to the defense counsel's follow-on questions, MSgt R indicated his perceptions of the system were based in part on quarterly reviews of court-martial results available through official Marine Corps websites. He stated that he sought out court-martial results to use as a "helpful training tool for young Marines[.]"[31]

He noted disparities in sentences between types of crimes and between geographic locations. For example, "this gentleman was convicted of rape and he got a very lenient sentence, w[h]ere this person was convicted of sexual assault and got a severe sentence."[32] He

---

[25] *Id.*

[26] *Id.* at 180.

[27] *Id.* at 182.

[28] *Id.* at 186.

[29] *Id.*

[30] *Id.* at 239.

[31] *Id.* at 242.

[32] *Id.* at 243.

considered this a disparity only in so much as he would generally expect a greater sentence in a rape case than in a sexual assault case "[o]r fraternization case."[33]

Earlier, when Government counsel asked, "[w]ould you agree that there are situations where individuals could be convicted of the same offense, but because of the different facts surrounding that offense, maybe they warranted different punishment?," he stated, "Yes, I agree."[34]

The trial defense counsel challenged MSgt R for cause for implied bias in that his "more than a mild interest" in courts-martial would raise questions in the eyes of the public as to his fairness during sentencing.[35]  In ruling on challenges, the military judge articulated the different tests for actual and implied bias, and highlighted that the liberal grant mandate applied to defense challenges for cause.  The military judge denied the defense challenge for cause based upon implied bias against MSgt R.  The appellant exercised his peremptory challenge against another panel member.

*Discussion*

R.C.M. 912(f)(1)(N) requires the removal of a court member "in the interest of having the court-martial free from substantial doubt as to legality, fairness and impartiality."  This rule encompasses both actual and implied bias.  *United States v. Clay,* 64 M.J. 274, 276 (C.A.A.F. 2007).  Although actual bias and implied bias are not separate grounds for challenge, they do require separate legal tests.  *Id.*  Challenges for both actual and implied bias are based on the totality of the circumstances.  *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007).  The burden of establishing the basis for a challenge is on the party making the challenge. *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (citing R.C.M. 912(f)(3)).

Because a challenge for actual bias was not directly raised by the appellant at trial and, therefore, not addressed by the military judge, we review whether the member was actually biased *de novo*.  *See United States v. Armstrong*, 54 M.J. 51, 53 (C.A.A.F. 2000) (holding that a challenge for cause under R.C.M. 912(f)(1)(N) encompasses both actual and implied bias: "[a]ctual bias and implied bias are separate legal tests, not separate grounds for challenge.") (citations omitted).

"Actual bias is personal bias that will not yield to the military judge's instructions and the evidence presented at trial."  *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted).  We decline to find actual bias in the context of this case in which there is no indication that MSgt R was unwilling or unable to yield to the military judge's direction or the evidence.  Indeed, MSgt R asked several questions of witnesses during trial that demonstrated an open and critical attitude towards the Government's case.

---

[33] *Id*. at 244.

[34] *Id*. at 237.

[35] *Id*. at 290.

The standard of review for implied bias is more deferential than *de novo* review, but less deferential than abuse of discretion. *United States v. Moreno*, 63 M.J. 129, 134 (C.A.A.F. 2006). However, military judges who place their reasoning on the record and consider the liberal grant mandate will receive more deference on review. *Clay*, 64 M.J. at 277.

The test for implied bias is objective. Viewing the situation through the eyes of the public and focusing on the perception of fairness in the military justice system, we ask whether, despite a disclaimer of bias, most people in the same position as the court member would be prejudiced. *Moreno*, 63 M.J. at 134. We ask whether there is too high a risk that the public will perceive that the accused received less than a court composed of fair and impartial members. *United States v. Wiesen,* 56 M.J. 172, 176 (C.A.A.F. 2001).

Here, the military judge clearly articulated her understanding of the differing tests for bias and the liberal grant mandate when ruling on challenges. She granted four defense challenges for cause for actual and/or implied bias, while invoking the liberal grant mandate when she believed the matter was close. She denied the defense challenge for cause against MSgt R, viewing his responses as those of an "engaged leader who is using the tools accessible to him to try to get to the left of sexual assault allegations amongst his Marines . . . . [I]t's the Court's opinion that if the public is looking at [MSgt R] objectively, he is the member that [they] would want."[36]

Based on the totality of the circumstances, we conclude that the military judge did not abuse her discretion in denying the appellant's challenge for cause as to implied bias. When viewed through the eyes of the public and focused on the perception of fairness in the military justice system, we conclude there is no risk that the public will perceive that the accused received less than a court composed of fair and impartial members based upon MSgt R's responses. *Wiesen,* 56 M.J. at 176.

## Ineffective Assistance of Counsel[37]

The appellant alleges his counsel were ineffective for (1) failing to assert that the appellant's pretrial restriction was tantamount to confinement, and (2) failing to raise objections pursuant to Article 25, UCMJ.

*Discussion*

The Sixth Amendment right to effective assistance of counsel at courts-martial is a fundamental right of service members. *United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F. 2000) (citing *United States v. Palenius*, 2 M.J. 86 (C.M.A. 1977)). Ineffective assistance of counsel involves a mixed question of law and fact. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). The ultimate determinations of whether defense counsel were deficient and whether the deficiency was prejudicial are reviewed *de novo*. *Id.*; *United States v. McClain*, 50 M.J. 483, 487 (C.A.A.F. 1999).

---

[36] *Id.* at 291.

[37] Raised as AOE (5) and (6).

We apply the two-prong test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) to determine whether counsel rendered ineffective representation. "The burden on each prong rests with the appellant challenging his counsel's performance." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005).

The first prong requires the appellant to show that counsel's performance fell below an objective standard of reasonableness, indicating that counsel was not functioning as counsel within the meaning of the Sixth Amendment. *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate representation. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004).

The second prong requires a showing of prejudice resulting from counsel's deficient performance. *Strickland*, 466 U.S. at 687. Such prejudice must result in the denial "of a fair trial, a trial whose result is unreliable." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citation and internal quotation marks omitted). The appropriate test for this prejudice is whether there is a reasonable probability that, but for counsel's error, there would have been a different result. *United States v. Quick*, 59 M.J. 383, 387 (C.A.A.F. 2004).

"When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant].' . . . Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697). That is the course we follow here.

Given our analysis above regarding restriction tantamount to confinement and the process for selection of members, the appellant has failed to demonstrate a reasonable probability that trial defense counsel would have been successful on either issue if raised at trial. As a result, we find no prejudice even assuming counsel's performance was deficient.

**Sentence Reassessment**

Courts of Criminal Appeals (CCA) can often "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]" *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). In such cases, CCA "act with broad discretion when reassessing sentences," and the Court of Appeals for the Armed Forces "will only disturb the [lower court's] reassessment in order to prevent obvious miscarriages of justice or abuses of discretion." *Id.* (citations and internal quotation marks omitted).

Reassessing a sentence is only appropriate if we are able to reliably determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000). A reassessed sentence must not only "be purged of

prejudicial error [but] also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We base these determinations on the totality of the circumstances of each case, guided by the following "illustrative, but not dispositive, points of analysis":

(1)  Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone.

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15-16.

Under all the circumstances presented, we find we are able to reassess the sentence and that it is appropriate for us to do so. Although the maximum punishment decreased from life without eligibility for parole to 30 years' confinement and the appellant elected to be sentenced by a panel of members, all other factors favor reassessment by this court. First, we have extensive experience and familiarity with the remaining convictions, as none presents a novel issue in aggravation. Second, the gravamen of the rape and sexual assault offenses is identical as the two offenses were offered as contingencies of proof for the same underlying conduct. Third, all of the evidence in aggravation, extenuation and mitigation remains, and no new forms or sources of sentencing evidence are apparently more relevant under the new offense vice the old. While in common vernacular and legal penalty, "rape" may be viewed more severely than "sexual assault," here words must take a back seat to evidence. And the import of the evidence adduced on the merits and at sentencing remains the same regardless of the terms used.

Taking these factors as a whole, we can confidently and reliably determine that absent the error, the members would have sentenced the appellant to the same sentence reached previously, that is: three years' confinement; reduction to pay grade E-1; forfeiture of all pay and allowances; and a bad-conduct discharge. Finally, we conclude that this sentence is an appropriate punishment for the remaining offenses and this offender——thus satisfying the *Sales* requirement that the reassessed sentence not only be purged of error, but appropriate. *Sales*, 22 M.J. at 308.

**Conclusion**

After carefully considering the record of trial and the pleadings of the parties, we find the rape conviction factually insufficient, dismiss Specification 1 of Charge II, and revive the

conditionally dismissed sexual assault conviction. We conclude that the findings as modified and the sentence as reassessed are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ. We affirm the modified findings and the sentence. The supplemental court-martial order shall correctly reflect the finding of guilty to Specification 2 of Charge II.

Senior Judge FISCHER and Senior Judge KING concur.

For the Court



R.H. TROIDL
Clerk of Court